Filed 9/16/13  In re K.F. CA2/3

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re K.F., a Person Coming Under the Juvenile Court Law. | B246587 |
| | (Los Angeles County Super. Ct. No. CK84483) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>        Plaintiff and Respondent,<br><br>    v.<br><br>C.F.,<br><br>        Defendant and Appellant. | |

        APPEAL from an order of the Superior Court of Los Angeles County,

Philip Soto, Judge.  Affirmed.


        Terence M. Chucas, under appointment by the Court of Appeal, for Defendant and

Appellant.


        John F. Krattli, County Counsel, James M. Owens, Assistant County Counsel, and

Aileen Wong, Deputy County Counsel, for Plaintiff and Respondent.

_____

**INTRODUCTION**

This is a juvenile dependency case involving C.F. (mother) and her daughter K.F. After the juvenile court entered orders terminating mother's reunification services and scheduling a Welfare and Institutions Code section 366.26[1] hearing regarding K., mother filed a petition pursuant to section 388 requesting that K. be returned to mother's custody or, in the alternative, that mother be provided six additional months of family reunification services. On October 31, 2012, the trial court entered an order denying mother's section 388 petition and terminating her parental rights to K. Mother appeals that order. We affirm.

**FACTUAL AND PROCEDURAL BACKGROUND**

1.    *K.'s Detention*

On September 20, 2010, mother was admitted to the UCLA Medical Center to terminate a pregnancy resulting from an alleged date rape. At the time of her admission, mother provided a urine sample, which tested positive for methamphetamines and opiates. Mother was administered medication to stop the fetal heartbeat and instructed to return the following morning for a procedure to remove the fetus. She failed to follow these medical instructions.

A week later, on September 27, 2010, mother was transported to UCLA Medical Center by ambulance with severe bleeding. Another drug test was taken, which again tested positive for methamphetamines and opiates. After treatment was administered, mother was interviewed by a social worker at UCLA. Mother reported that she and her six-year-old daughter, K., were living with mother's boyfriend in a one-room apartment and that K. currently was being watched by an acquaintance because mother was concerned about leaving K. with her boyfriend. When told she had tested positive for opiates and methamphetamines, mother denied taking any illicit drugs. The UCLA social worker contacted the Los Angeles County Department of Children and Family Services

---

[1]    All statutory references are to the Welfare and Institutions Code.

(Department) over concerns about mother's judgment, mental health and ability to care for K.

On September 28, 2010, a social worker from the Department went to mother's home. The social worker observed what appeared to be drug transactions occurring at the front door and considerable foot traffic in and out of the home. The social worker telephoned the acquaintance with whom mother had left K. and was advised that she had taken K. to a fast food restaurant several blocks away. At 3:30 p.m., the social worker arrived at the fast food restaurant and interviewed K. When asked how she felt, K. reported that she was hungry because this was the first meal she had eaten all day. K. told the social worker that she was not allowed to eat food in the home because it belonged to other people. When asked if she attended school, K. reported that she had never attended school and needed to take care of her mother. K. stated that her mother gets really sick and stays in bed all day, during which time K. took care of herself. K. also reported that her mother got into frequent arguments with mother's boyfriend and another man with whom they shared the apartment, that mother "yells and screams at them all the time" and that K. had to "stand in front of [mother] to protect her." K. was detained by the Department.

Following K.'s detention, mother admitted that the home where she and K. lived was a "tweeker house." Mother's acquaintance who had been caring for K. admitted to being on probation for a drug related offense. During a visit with K. on September 30, 2010, mother grabbed K. and fled. The police were called but mother returned K. before police arrived. The same day, UCLA reported that mother had been abusive to medical staff and threatened to kill the UCLA social worker that referred mother's case to the Department.

On October 1, 2010, the Department filed a juvenile dependency petition regarding K. The petition alleged that the juvenile court had jurisdiction over K. pursuant to section 300, subdivisions (b) and (g), on the grounds that mother (1) used methamphetamine; (2) created a detrimental home environment for K. by exposing her to illicit drug sales and drug users; (3) failed to make an appropriate plan for K.'s care and supervision; and (4) failed to provide K. with adequate food.

The juvenile court found that a prima facie case for detaining K. had been established. The court ordered the Department to provide mother with family reunification services and to refer mother to weekly random drug testing, drug counseling, and individual counseling. Mother was granted monitored visits with K. a minimum of three times a week.[2]

2.      *Mother's Abduction of K.*

On November 5, 2010, mother surreptitiously went to K.'s school without the Department's permission or knowledge. Mother forged the foster father's name on a parental sign-out sheet and told the classroom teacher that she was taking K. to the dentist. Unaware that mother did not have custody of K., the classroom teacher mistakenly allowed mother to leave with K.

On November 12, 2010, the juvenile court issued an arrest warrant for mother and a protective warrant for K. Over a month later, police found mother and K. at a motel. Mother was arrested and K. was returned to the Department's custody. The juvenile court recalled the warrants and ordered that mother's visits with K. were to be monitored and take place only at the Department's offices.

---

[2]      Mother reported that K.'s presumed father is deceased. The Department was unable to locate the presumed father.

4

3. *Jurisdiction and Disposition Order*

On February 23, 2011, the juvenile court sustained the petition for juvenile dependency on all counts, declared K. a dependent child of the court, and removed K. from mother's physical custody. The court ordered mother to complete a reunification plan that included random drug testing, drug counseling, a parenting class and individual counseling. Mother was granted monitored visits with K., three times a week for two hours each visit.

4. *Mother's Failure to Comply with Random Drug Testing and Arrest for Drug Possession*

Between the detention hearing on October 1, 2010 and the jurisdiction/disposition hearing on February 23, 2011, mother failed to show for any of the 11 drug tests requested by the Department. Mother, nevertheless, maintained that she had never used drugs and had failed to show for the tests only because she was depressed over having lost custody of K.

On March 17, 2011, mother was arrested for possession of a controlled substance. According to the police report, mother and her boyfriend were found residing at a motel that was frequented by narcotics users and dealers. During a motel registry check, officers recognized the name of mother's boyfriend, who had two active felony narcotics warrants. After serving the warrants on mother's boyfriend, the officers found mother lying in bed near a glass narcotics pipe containing methamphetamine residue and a plastic cylinder and baggie also containing methamphetamine. During a strip search of mother following her arrest, police found another plastic baggie containing methamphetamine.

On April 18, 2011, the criminal court ordered mother to enroll in an approved plan for drug abuse counseling, treatment and rehabilitation as part of a deferred entry of judgment program for her narcotics arrest. Mother filed papers with the criminal court indicating she had enrolled in a drug and alcohol on demand testing program through the Department. Mother, however, continued to record "no shows" for the random drug tests arranged by the Department, resulting in her termination from the program in May 2011.

In July 2011, the Department reinstated mother's random drug testing referral, but mother still failed to show for each random drug test through December 2011.

After December 2011, mother reported to the Department that she was enrolled in an outpatient drug program at El Proyecto Del Barrio. However, when the Department contacted the program's intake coordinator for confirmation of mother's enrollment, the coordinator advised that mother had failed to show for an intake appointment and had not enrolled or participated in the program. When confronted with these statements, mother asserted that the coordinator was mistaken and assured the Department that she would provide a letter verifying her enrollment. Mother never provided the promised verification. The Department later confirmed that El Proyecto Del Barrio does not provide verification of enrollment or participation to the client. El Proyecto Del Barrio advised that such verifications are provided to only the social worker or the court.

7.      *Mother's Harassment of K.'s Foster Parents*

On October 2, 2011, the Department received notice from K.'s foster mother that she was no longer willing to care for K. due to harassing behavior by mother, including false accusations against the foster family, and numerous abusive telephone calls and text messages by mother. Although the Department attempted to work with the foster mother in hopes of saving the foster care placement, mother's harassment continued and the placement was ultimately disrupted.

On October 19, 2011, K. was placed in a new foster home where she reported she felt comfortable and safe. The foster mother stated that she loved having K. in the home and expressed interest in taking legal guardianship of K. should mother fail to reunify. However, by February 2012, K.'s foster mother reported that if mother's constant phone calls and harassing voicemail messages did not stop, she would need to request that K. be removed from her home. When mother was advised by the Department's social worker that her harassing behavior put K. at risk of being transferred again, mother became upset and refused to discuss the issue.

6

On April 20, 2012, K. was moved to the foster-adopt home of Mr. and Mrs. P. Due in part to mother's history of harassment, the juvenile court ordered mother not to directly or indirectly contact K.'s foster-adopt parents. Despite the court's order, mother continued to send harassing text message to the foster-adopt parents.

In September 2012, after a scheduled visit with K., mother and a male companion were seen waiting in a car outside the office where the visit had occurred, apparently watching for the foster-adopt parents to pick up K. The Department social worker and the foster parents were concerned that mother meant to follow K. to her foster home.

8. *The Juvenile Court Orders Termination of Reunification Services and Schedules a Section 366.26 Hearing*

On January 12, 2012, the juvenile court found that mother had failed to comply with the reunification plan, ordered mother's family reunification services terminated, and scheduled a permanent placement hearing for K. under section 366.26.

9. *The Foster-Adopt Parents*

As stated, on April 20, 2012, K. was placed with foster-adopt parents Mr. and Mrs. P. She developed a strong emotional bond with the foster-adopt family and adjusted well to the home. The Department reported that the foster-adopt parents were providing K. with a loving and stable environment and ensuring that K. knew their home could be a "Forever Home." K. told the Department social worker that she did not want to go to another foster home and would be "happy" if she could stay with her foster-adopt family.

10. *Mother's Section 388 Petition and Submission of an Apparently Fabricated Report Regarding Her Parenting Class Attendance*

On August 21, 2012, mother filed a section 388 petition requesting that the juvenile court modify its order terminating reunification services and scheduling a section 366.26 hearing. Mother requested that K. be returned to her custody or, in the alternative, that six additional months of family reunification services be provided, with liberalized visitation.

In her petition, mother represented that she had completed 49 out of 52 parenting classes with The Village Family Services (VFS). Mother submitted a progress report, dated August 9, 2012, purportedly prepared by VFS, showing that she had attended 48 sessions of the parenting class, with only three missed sessions, and had "outstanding attendance in class." The progress report was purportedly signed by VFS group facilitator Antonio Cavazos.

Mother's petition also represented that she had completed a substance abuse program in connection with her March 2011 arrest and the criminal court's deferred entry of judgment program. Her petition included an April 9, 2012 minute order by the criminal court that stated "DEJ [deferred entry of judgment] program is deemed completed by the court."

Additionally, mother's petition included a letter from her individual therapist discussing her attendance and progress in counseling sessions. Mother's therapist stated that he would have "no problem recommending that [mother] have full custody of [K.]." Mother also submitted a letter from her employer and pictures of her current two bedroom/two bathroom apartment, including a picture of a bed for K. Mother stated that K. would have her own bedroom, bathroom and desk for homework.

In its response to mother's section 388 petition, the Department raised serious concerns about the authenticity of the VFS progress report and mother's representations regarding her attendance at parenting classes. The Department reported that it had confirmation from VFS that its counselor, Mr. Cavazos, had not prepared the progress report submitted by mother with her section 388 petition. VFS also confirmed that its most recent progress reports for mother, prepared in May 2012 and signed by Mr. Cavazos, showed that mother had completed only 18 parent education classes, missed 11 classes, had "average attendance in class[,]" and had been disenrolled from the program for missing three consecutive classes. The Department's response also included a letter from VFS, listing multiple inconsistencies between its records and the apparently fabricated progress report submitted by mother.

8

With respect to mother's completion of a substance abuse program through the criminal drug court, the Department raised similar doubts about mother's veracity. The Department noted that the criminal court minute order indicated that mother had submitted multiple apparently fabricated progress reports from VFS to the court, including one showing she had attended as many as 33 parenting classes. Further, despite mother's repeated assurances that she would provide direct verification from the drug treatment program of her participation and attendance, mother failed to provide any such proof to the Department.

11. *The Juvenile Court Denies Mother's Section 388 Petition and Terminates Parental Rights*

On October 31, 2012, the juvenile court simultaneously held a hearing on mother's section 388 petition and a section 366.26 hearing. Prior to the hearing, mother submitted a last minute information attaching another progress report purportedly prepared by VFS on October 3, 2012, stating that mother had "completed all court mandated 52 sessions" and that "[i]n regards to conflicting progress reports, our system was not updated at the time." The new progress report contained many of the same inconsistencies VFS had identified as indications that mother's earlier progress report was fabricated.

At the hearing on mother's section 388 petition, her therapist testified about the strides mother had made to address impulsivity issues that he believed had previously hindered her ability to create a stable environment for K. While mother needed to continue to work on being a better parent, her therapist testified that he did not believe she had any significant shortcomings that should prevent her from having K. back in her care. He testified that he had never seen mother under the influence of drugs and did not believe she had a drug problem. He testified about the bond he observed between mother and K. and offered his opinion that severing that bond would be harmful to K.

9

Mother testified that she had completed a parenting class through VFS and denied falsifying any documents. Mother claimed that the discrepancies in VFS's records stemmed from her having three court cases with VFS (the case related to K.'s abduction, the criminal narcotics case and the dependency case), and that VFS sometimes credited her attendance to one case number without crediting it to the other cases. Mother also testified that she had completed a substance abuse program in connection with her criminal case. She stated she received a certificate upon completion, but did not have a copy because it had been given to her in a sealed envelope that she filed with the criminal court. When asked by the juvenile court why she had not attended the parenting classes and submitted to drug testing when reunification services were first ordered, mother testified that her failure to comply with the reunification plan stemmed largely from her incarceration and the difficulty she had reestablishing herself after she was released from jail.

The juvenile court denied mother's section 388 petition. The court found mother's testimony concerning her parenting class attendance and participation in a substance abuse program was not credible. Notwithstanding K.'s apparent bond with mother, the juvenile court determined that returning K. to mother's custody would not be in K.'s best interest.

After ruling on mother's section 388 petition, the juvenile court addressed the section 366.26 issues. Mother argued that the beneficial relationship exception under section 366.26, subdivision (c)(1)(B) applied and that terminating her parental rights would be detrimental to K. The juvenile court found that K. was adoptable and no exception to adoption applied. The court determined that returning K. to mother's custody would be detrimental to K.

On October 31, 2012, the juvenile court entered its order denying mother's section 388 petition and terminating mother's parental rights under section 366.26. This appeal followed.

**CONTENTIONS**

Mother argues the juvenile court abused its discretion in denying her section 388 petition because it failed to credit evidence demonstrating a change in circumstances; namely, evidence showing she had completed a parenting class and substance abuse program and other evidence demonstrating efforts to comply with the reunification plan. Mother also contends that the juvenile court's order rejecting the beneficial relationship exception and terminating her parental rights under section 366.26 was not supported by substantial evidence. We find no reversible error with respect to either contention.

**DISCUSSION**

1. *The Juvenile Court Did Not Abuse Its Discretion in Denying the Section 388 Petition*

Under section 388, a parent may petition the juvenile court on the basis of a change of circumstances to modify or set aside a previous order pertaining to a dependent child. The parent bears the burden of showing both (1) a change of circumstances since the order was issued and (2) that the proposed modification is in the child's best interests. (*In re Casey D.* (1999) 70 Cal.App.4th 38, 47.)

"Not every change in circumstance can justify modification of a prior order. [Citation.] The change in circumstances must relate to the purpose of the order and be such that the modification of the prior order is appropriate." (*In re A.A.* (2012) 203 Cal.App.4th 597, 612.) "A petition which alleges merely changing circumstances and would mean delaying the selection of a permanent home for a child to see if a parent, who has repeatedly failed to reunify with the child, might be able to reunify at some future point, does not promote stability for the child or the child's best interests. [Citation.] ' "[C]hildhood does not wait for the parent to become adequate." ' " (*In re Casey D.*, *supra*, 70 Cal.App.4th at p. 47.)

11

We review the juvenile court's ruling on a section 388 petition for abuse of discretion. (*In re Stephanie M.* (1994) 7 Cal.4th 295, 318.) "The appropriate test for abuse of discretion is whether the trial court exceeded the bounds of reason. When two or more inferences can reasonably be deduced from the facts, the reviewing court has no authority to substitute its decision for that of the trial court." (*Shamblin v. Brattain* (1988) 44 Cal.3d 474, 478-479; see also *In re Stephanie M.,* at pp. 318-319.)

Here, the juvenile court found there had not been a change in circumstances justifying modification of its previous orders. Mother argues that this finding constitutes an abuse of discretion because the court failed to credit "strong evidence that [mother] had successfully addressed the drug problem that led to K.'s dependency case." We find no abuse of discretion.

Mother principally relies upon two documents she submitted in support of her section 388 petition: (1) a progress report purportedly prepared by VFS showing that she had substantially completed a 52-session parenting class, and (2) a minute order by the criminal court suggesting she completed a substance abuse program in connection with the deferred entry of judgment proceedings. The authenticity and credibility of these documents was called into serious doubt by other evidence received by the juvenile court. In particular, the Department presented a letter from VFS stating that VFS had not prepared the progress report mother submitted with her section 388 petition.[3] Further, as the Department pointed out, the criminal court minute order contained entries suggesting that mother had submitted similarly fabricated VFS progress reports to the criminal court. And, the evidence was undisputed that mother had failed to show for every single random drug test requested by the Department.

---

[3]  In a last minute information statement filed the day before the hearing on her section 388, mother submitted a purported subsequent VFS progress report stating that mother had "successfully completed all court mandated 52 sessions." That report, however, contained many of the same discrepancies that VFS had identified in its letter as indications that mother fabricated the earlier progress report. The juvenile court could have reasonably inferred that this progress report also was fabricated.

Citing statements made by the juvenile court in ruling on her section 388 petition, mother contends that the court mistakenly confused the inconsistencies related to her attendance at VFS parenting classes with, what mother argues is, unimpeachable evidence in the criminal court's minute order establishing that she completed a substance abuse program.[4] Mother insists that the "controversy over the number of parenting classes she attended at VFS" was irrelevant to the criminal court's determination that she completed a substance abuse program. We disagree.

As discussed, the criminal court minute order contained entries suggesting mother submitted fabricated documents to that court. For example, the minute order reflects mother's submission of a purported VFS progress report stating that she completed 33 parenting classes. However, according to VFS, mother had completed only 18 parenting classes when she was dismissed from the program. Based on this evidence, the juvenile court could reasonably infer that mother submitted fabricated documents to the criminal court. The juvenile court also could reasonably infer that mother misled the criminal court about her participation in a substance abuse program. Based on this record, we cannot say that the juvenile court abused its discretion in rejecting mother's evidence and finding that she had failed to ameliorate the substance abuse and parental neglect issues that originally warranted the court's exercise of jurisdiction over K.

---

[4]     In rejecting mother's claim that she had completed a substance abuse program in connection with her criminal case, the juvenile court commented: "I'm familiar with how the CASC program and P.C. 1000 courts work, because I've been a judge in the DEJ Courts, Prop. 36 courts. I know how they work. That's not how they work. And even if it was the case, certainly the mother could have made sure that there were three separate reports that said that, 'okay. I did 18 in one. I did 19 in another. I did 20 in the other,' or whatever. They should all add up to the number that she claims to have been completed. But it doesn't add up. The math doesn't add up." The statement may refer to mother's contention that VFS's records did not reflect all the classes she attended because she had three different case numbers with VFS. Be that as it may, the evidence was nevertheless sufficient to support the juvenile court's rejection of mother's explanation and, thus, also supported a reasonable inference that mother had submitted fabricated documents to the criminal court regarding her participation in a drug treatment program.

For the same reasons, the juvenile court did not abuse its discretion in finding that returning K. to mother's custody or ordering additional reunification services would not be in K.'s best interests. Mother and her therapist testified about mother's commendable efforts to create a more stable environment for K. However, at the time of the hearing, K. had been detained for over two years. There was substantial evidence that, during those two years, mother had failed to follow the court's orders regarding random drug testing, parenting classes and other aspects of the reunification plan. Under such circumstances, the juvenile court acted within its discretion in determining that further reunification services would "not promote stability for the child or the child's best interests." (*In re Casey D.*, *supra*, 70 Cal.App.4th at p. 47.)

2. *Substantial Evidence Supports the Juvenile Court's Order Terminating Mother's Parental Rights*

A section 366.26 hearing proceeds on the premise that the efforts to reunify the parents and child are over, "and the focus of the hearing is on the long-term plan for care and custody." (*In re Jasmine J.* (1996) 46 Cal.App.4th 1802, 1808.) As a general rule, "[t]he court must . . . terminate parental rights if clear and convincing evidence shows that it is likely that the minor will be adopted." (*Ibid.*) Section 366.26, subdivision (c)(1)(B) provides an exception to this general rule where the juvenile court "finds a compelling reason for determining that termination would be detrimental to the child due to . . . the following circumstances: [¶] (i) The parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship." We review a juvenile court's order terminating parental rights under the substantial evidence standard. (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 576; but see *In re Jasmine D.* (2000) 78 Cal.App.4th 1339, 1351 [applying abuse of discretion standard].)

Mother does not dispute the juvenile court's finding that K. was adoptable. Rather, she contends that the beneficial relationship exception under section 366.26, subdivision (c)(1)(B)(i) applies.

14

"In the context of the dependency scheme prescribed by the Legislature, we interpret the 'benefit from continuing the [parent/child] relationship' exception to mean the relationship promotes the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents. . . . [¶] . . . The exception applies only where the court finds regular visits and contact have continued or developed a significant, positive, emotional attachment from child to parent." (*In re Autumn H., supra,* 27 Cal.App.4th at p. 575, citations omitted.)

The present case is difficult because, as the juvenile court acknowledged, mother loves K. and they share a bond as mother and daughter. Nevertheless, substantial evidence clearly supports the juvenile court's determination that K.'s relationship with mother did not outweigh the benefits K. would receive in a permanent home with the prospective adoptive parents. When K. was detained, mother had twice tested positive for methamphetamines. At the time of her detainment, K. was six years old. She reported that she had never attended school and needed to take care of her mother, who frequently stayed in bed all day, during which time K. was forced to take care of herself. Despite denying that she had a substance abuse problem, mother was arrested for possession of methamphetamine, failed to submit to a single Department-approved random drug test, attempted on numerous occasions to mislead Department social workers regarding her participation in substance abuse programs, and possibly misled the criminal court concerning her participation in such programs. Based on this substantial evidence, the juvenile court could reasonably conclude that mother was unable to protect K. from the risk of physical or emotional harm arising from her continued drug use.

In addition, there was evidence that the benefit to K. of mother's relationship was diminishing. Although mother maintained visitation to the extent it was permitted, her abduction of K. and inability to refrain from harassing K.'s foster parents had compelled the juvenile court to limit mother's visitation rights to only two supervised visits per month. Department reports also observed that although K. did not display major behavioral or emotional issues in her foster parents' home, she became increasingly anxious after phone calls and visits with her mother.

At the same time, the Department reported that K. is thriving in the foster-adopt home, that she appears to be emotionally bonded to the foster-adopt parents and enjoys being part of their large family. The prospective adoptive parents provide K. with a loving and stable home. K. has told Department social workers that she would be "happy" if she could stay in her foster-adopt home. There was substantial evidence to support the conclusion that it was in K.'s best interest to move forward with her life as an adopted child rather than continuing her legal relationship with mother.

**DISPOSITION**

The juvenile court's order terminating mother's parental rights and denying her section 388 petition is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

KITCHING, J.

We concur:

KLEIN, P. J.

CROSKEY, J.

17